**Athalie Irvine SMITH, Plaintiff,**

v.

**THE JAMES IRVINE FOUNDATION, a Corporation et al., Defendants.**

**Civ. A. No. 66–1285.**

United States District Court
C. D. California.

Dec. 18, 1967.

Lyndol L. Young, Thomas V. Girardi, Los Angeles, Cal., C. Ray Robinson, Merced, Cal., for plaintiff, Athalie Irvine Smith.

McCutchen, Black, Verleger & Shea, Howard J. Privett, Sheldon A. Gebb, Los Angeles, Cal., Burnham Enersen, San Francisco, Cal., for defendants, The James Irvine Foundation, N. Loyall McLaren, A. J. McFadden, James G. Scarborough, Robert H. Gerdes, James H. Metzgar, Edward W. Carter, Mark R. Sullivan, John V. Newman, John A. Murdy, Jr., Morris M. Doyle, and William Bradford Hellis.

Pillsbury, Madison & Sutro, Charles B. Renfrew, San Francisco, Cal., for defendant, Kate L. Wheeler.

Gibson, Dunn & Crutcher, William French Smith, Robert S. Warren, Jan Vetter, Los Angeles, Cal., for defendant, The Irvine Co.

Latham & Watkins, Ira M. Price, II, John P. McLoughlin, Los Angeles, Cal., for defendant, Linda Irvine Gaede.

Lillick, McHose, Wheat, Adams & Charles, John F. Kimberling, Los Angeles, Cal., for defendants, Gloria Wood Irvine and Security First National Bank, a national banking association, as executors and trustees of the estate of Myford Irvine, deceased.

Elden C. Friel, San Francisco, Cal., for defendant, William Thornton White, Jr., as executor of the estate of Katharine Brown Irvine, deceased.

Carl Boronkay, Deputy Atty. Gen., Los Angeles, Cal., for defendant Thomas C. Lynch, Attorney General of the State of California.

Hall, Henry, Oliver & McReavy, Stephen McReavy, James L. Tipton, San Francisco, Cal., for defendants, N. Loyall McLaren and Robert H. Gerdes in their capacity as trustees of the trusts established by the will of James Irvine, deceased.

## MEMORANDUM

GRAVEN, Senior District Judge (by assignment).

The plaintiff in this action is an heir at law and a beneficiary under the will of James Irvine, deceased. He was her paternal grandfather. She commenced this action on August 10, 1966. She asks that certain shares of corporate stock of The Irvine Company standing in the name of The James Irvine Foundation be held to be a part of the assets of the estate of James Irvine. She also asks for damages and an accounting in connection therewith. The trial was to the Court. By agreement of the parties, the matter of damages and accounting was to await the determination of the other issues in the case. Jurisdiction is based upon diversity of citizenship. The plaintiff is a citizen of the State of Virginia. All of the defendants, for federal court jurisdictional purposes, are citizens of the State of California. The applicable substantive law is that of the State of California.

The stock involved constitutes the majority of the stock of The Irvine Company. That corporation has large assets. Its largest asset is a tract of land known as The Irvine Ranch. That ranch consists of approximately 88,000 acres of land in Orange County, California. It is in the metropolitan area of Los Angeles. Estimates of the present value of the ranch range from one-half billion dollars to a billion and one-half dollars. The ranch was a consolidation of early Spanish land grants, which consolidation was made by the father of James Irvine who was an early California pioneer. He died on March 15, 1886, and James Irvine, his only child born in 1867, succeeded to the ownership of the ranch. In 1894 he caused The Irvine Company to be incorporated under the laws of West Virginia. Its capital stock consisted of 1,000 shares of common stock, all of which, except qualifying shares, were issued to him. He owned the qualifying shares by endorsement. James Irvine transferred the ownership of the ranch to the corporation. The principal place of business of the corporation has been and is the ranch. The ranch has been the subject matter of numerous writings, among which are the books by Robert Glass Cleland, "The Irvine Ranch" (1962) and "The Irvine Ranch of Orange County" (1952), both of which were exhibits in the case.

James Irvine was a shrewd and successful business man. He greatly augmented the property that came to him from his father. During his entire lifetime James Irvine was a resident of the City of San Francisco, San Francisco County, California, where he maintained his place of business.

He was President of The Irvine Company from the time of its incorporation

until his death on August 24, 1947. Upon his death his son Myford, who had been closely associated with him in his business affairs, became President of the company and continued as such until his death on January 11, 1959.

Commencing sometime prior to 1936 James Irvine began to give consideration to the matter of establishing a foundation. He caused The James Irvine Foundation to be incorporated under the laws of the State of California. Its articles of incorporation are as follows:

## "ARTICLES OF INCORPORATION
## OF
## THE JAMES IRVINE FOUNDATION

KNOW ALL MEN BY THESE PRESENTS:

"That we, the undersigned, incorporators and first directors of The James Irvine Foundation, have executed this instrument for the purpose of forming a corporation under the laws of the State of California, and we hereby certify and declare

"First: That the name of this Corporation is

## 'THE JAMES IRVINE FOUNDATION'

"Second: That this corporation is formed solely for charitable purposes, namely, public welfare, health, education, comfort, happiness and general well-being, particularly of the citizens and residents of the State of California, or any part thereof, and that this is a corporation which does not contemplate pecuniary gain or profit to the members thereof. Incidental to and for the purpose of carrying out the aforesaid purpose, this corporation shall have power to receive property by gift, devise or bequest and otherwise to acquire and hold all property, real or personal, including shares of stock, bonds and securities of other corporations; to act as trustee under any trust incidental to the aforesaid purposes of this corporation, and to receive, hold, administer, and expend funds and property subject to such trust; to convey, exchange, lease, mortgage, encumber, transfer upon trusts or otherwise handle or dispose of any and all property, real and personal; to borrow money, contract debts, and issue bonds, notes and debentures and secure the same; to contract and be contracted with; to sue and be sued and to do any and all other acts necessary or expedient for the administration of the affairs and attainment of the purposes of the corporation.

"Third: The principal office for the transaction of the business of the corporation is to be, and shall be, located in the City and County of San Francisco, State of California.

"Fourth: The names and addresses of the persons who are to act in the capacity of directors of this corporation until the selection of their successors and who shall constitute the number of directors of this corporation are as follows:

| Name | Address |
|---|---|
| Myford Irvine | San Francisco, California |
| Katharine Irvine | San Francisco, California |
| W. H. Spaulding | San Francisco, California |
| N. L. McLaren | San Francisco, California |
| James G. Scarborough | Los Angeles, California |
| Paul A. Dinsmore | San Francisco, California |
| A. J. McFadden | Santa Ana, California |

"Fifth: The authorized number and qualifications of the members of this corporation are as follows:

"The members of this corporation shall be seven in number and each member shall be a director of this corporation. Vacancies in any number of members or directors for any cause shall not dissolve or otherwise affect the existence of this corporation, but the remaining members and directors shall function; provided that vacancies must be filled that there shall be not less than five members and directors, and if at any time the number of members and directors shall for any cause be reduced to less than five, the remaining members and directors shall take no action until the number has been increased to five, except to so increase the number; provided, further, that the number of members and directors shall not be permitted to continuously remain at less than seven for a longer period than one year. Vacancies shall be filled by affirmative vote of the remaining members; provided that no new member of this corporation shall be chosen or elected, whether to fill a vacancy or otherwise, except by affirmative vote of at least five of the then members of this corporation, unless for any cause the number be reduced to less than five, then only by the unanimous affirmative vote of the then remaining members. All memberships shall be of one class and each member shall have equal voting rights with each other member, and no member shall be liable for any dues or assessments or debts, liabilities or obligations of the corporation. This is and shall always remain a charitable corporation, and no member or director thereof shall ever have, own, or enjoy any personal property right or interest in or to any of the property of this corporation.

"Sixth: The term of this corporation shall be perpetual.

"Seventh: These articles of incorporation and any provision or provisions thereof may be amended in any lawful manner, with affirmative vote or written consent of not less than six of the members of this corporation; provided, however, that never, so far as it is lawful so to provide, shall the purposes of this corporation be changed or any of its property be diverted from the charitable uses and purposes for which this corporation is formed.

"A code of by-laws of this corporation shall be adopted by the written consent of all the members thereof.

"IN WITNESS WHEREOF, we have hereunto set our hands this 1st day of December, 1936.

MYFORD IRVINE
KATHARINE IRVINE
W. H. SPAULDING
N. L. McLAREN
JAMES G. SCARBOROUGH
PAUL A. DINSMORE
A. J. McFADDEN"

The members of the first Board of Directors were designated by James Irvine. They included his son Myford and his wife, Katharine. They both served as such during their lifetimes. James Irvine was never a Director or an officer of the Foundation. Members of his family at all times constituted a minority of the Board of Directors. The Directors constituted the members of the Foundation.

On February 24, 1937, James Irvine executed an indenture of trust in which that Foundation was designated as trustee. In the indenture of trust it is stated that he transferred, assigned and set over to the trustee 505 shares of stock of The Irvine Company. Later five additional shares of stock of The Irvine Company were included. In 1963 the company redeemed a number of its shares. At the present time there are 855 shares of its stock outstanding of which 459 shares stand in the name of The James Irvine Foundation. This litigation revolves around the status of those shares.

James Irvine died testate on August 24, 1947. His will, dated May 14, 1946, was admitted to probate by the Superior

Court of the State of California In and For the City and County of San Francisco on September 17, 1947. On December 29, 1952, a final decree of distribution of the assets of his estate was entered by that Court and the estate closed. The 510 shares of stock of The Irvine Company were not administered on in the estate proceedings nor included in the decree of distribution. It is the claim of the plaintiff that they should have been included in the distribution of the property of the estate. She asks, as heretofore noted, that they now be held to be a part of the assets of the estate.

In the plaintiff's original complaint herein the defendants were The James Irvine Foundation, The Irvine Company, N. Loyall McLaren, A. J. McFadden, James G. Scarborough, Robert H. Gerdes, Kate L. Wheeler, James H. Metzgar, Edward W. Carter, Mark R. Sullivan, John V. Newman, John A. Murdy, Jr., Morris M. Doyle, and William Bradford Hellis. The individual defendants named either are or had been Directors of The James Irvine Foundation. Except for Kate L. Wheeler, none of the individual defendants were relatives of James Irvine or individually interested in his estate. Kate L. Wheeler is an heir at law and a beneficiary under the will of James Irvine. He was her maternal grandfather. Presently she is the only member of the James Irvine family serving on the Board of Directors of the Foundation.

The defendants filed a motion stating that there were certain other parties who, because of their interests in the subject matter of the action, should be made parties to the action. Those parties designated were Linda Irvine Gaede; Gloria Wood Irvine and Security First National Bank as Executors and Trustees of the Estate of Myford Irvine; William Thornton White, Jr., Executor of the Estate of Katharine Brown Irvine; N. Loyall McLaren and Robert H. Gerdes in their capacity as Trustees of the Trusts established by the will of James Irvine, Deceased; and Thomas C. Lynch, Attorney General of the State of California. The parties named other than the Attorney General were either beneficiaries under the will of James Irvine or representatives of beneficiaries under his will. Without objection, an order was entered joining all of the parties designated as additional defendants.

James Irvine had three children: James III, Kathryn Helena and Myford. James Irvine III and Kathryn Helena predeceased him. The plaintiff is a daughter of James Irvine III. James Irvine III died in 1935. The plaintiff was born in 1933. She attained her majority by marriage in 1952. During her minority her mother was guardian of her person and property. Kate L. Wheeler is a daughter of Kathryn Helena. Kathryn Helena died in 1920. Myford Irvine survived James Irvine. He died testate on January 11, 1959. His estate is still open. The defendant Linda Irvine Gaede is his daughter. James Irvine established a number of trusts under his will. N. Loyall McLaren and Robert H. Gerdes are the trustees of those trusts. Katharine Brown Irvine, the wife of James Irvine, survived him. She was a beneficiary under his will. She died in 1950. Her estate is still open. All of the persons having an interest in the estate of James Irvine are parties to this action either individually or by representation. Thomas C. Lynch, Attorney General of the State of California, is a party in interest under the provisions of the Uniform Supervision of Trustees for Charitable Purposes Act (California Government Code), Sections 12580–12595. Section 12591 of that Act provides, in part:

"* * * No court shall have jurisdiction to modify or terminate any trust of property for charitable purposes unless the Attorney General is a party to the proceedings."

After the additional parties were joined, the plaintiff amended her complaint accordingly. The defendant The Irvine Company takes the position, and correctly so, that none of its rights and interests are involved. The defendants Linda Irvine Gaede and William Thornton White, Jr., as Executor of the Estate of Katharine Brown Irvine, each take what

is, in substance, a neutral position. All of the other defendants ask that the stock in question be held to be the property of The James Irvine Foundation and that the trust be held to be a valid charitable trust. For convenience in reference, when reference is made to the contentions of the defendants such will refer to the contentions made by some of the defendants other than the defendants The Irvine Company, Linda Irvine Gaede and William Thornton White, Jr., as Executor of the Estate of Katharine Brown Irvine, Deceased.

The James Irvine Foundation, as heretofore noted, was incorporated on January 6, 1937. On February 1, 1937, an organizational meeting of the Foundation was held. Myford Irvine was elected President. He continued to serve as such until his death in 1959. E. M. Price (Miss Edna M. Price) was elected Secretary and Treasurer. She served as such until her death in 1959.

On February 24, 1937, James Irvine executed the indenture of trust heretofore referred to. That indenture is next set forth:

"THIS INDENTURE OF TRUST, made this 24th day of February, 1937, by and between JAMES IRVINE, of San Francisco, California, Trustor, and THE JAMES IRVINE FOUNDATION, a corporation organized and existing under the laws of the State of California, trustee,

### WITNESSETH:

"That the trustor hereby transfers, assigns and conveys to the trustee, to have and to hold in trust, nevertheless and for the following trust uses and purposes, the following securities, to-wit:

"—505—shares of the capital stock of The Irvine Company, a corporation organized and existing under the laws of the State of West Virginia, and evidenced by the following certificates for the following number of shares, to-wit:

| Certificate Number | Number of Shares |
|---|---|
| 28 | 332 |
| 33 | 132 |
| 42 | 41 |

"Also, the 200 shares of the capital stock of the Irvine Company now evidenced by Certificate Number 40, and now held in trust under the terms set forth in that certain Indenture of Trust dated May 21, 1921, between James Irvine, Jr., and James Irvine, and all interest, present and future, of the trustor herein in or to said 200 shares or any thereof.

"Also—12,750—shares of The Moraga Company, a corporation organized and existing under the laws of the State of California, and evidenced by the following certificates for the following number of shares, to-wit:

| Certificate Number | Number of Shares |
|---|---|
| 33 | 10,200 |
| 54 | 400 |
| 55 | 400 |
| 56 | 400 |
| 57 | 400 |
| 58 | 200 |
| 66 | 100 |
| 67 | 200 |
| 68 | 200 |
| 69 | 200 |
| 71 | 50 |

"It is understood and hereby made an express term and condition of this trust that other and additional or other property may from time to time hereafter be added by the trustor to the trust property and become a part of the corpus of this trust, to be held under all of the terms hereof.

"It is also understood and hereby made an express term and condition of this trust that the trustor may at any time and from time to time, at his sole will and discretion, by written instrument filed with the trustee, revoke this trust in whole or in part, and may withdraw therefrom all or any part or parts of the property which may have been contributed to this trust by him, including all or any part or parts of the stocks hereinabove specifically described; and upon any such withdrawal, the trustee shall forthwith convey and transfer by proper instruments and deliver the property affected thereby to the trustor; and the trustor may at any time amend this

trust without limitation, or amend or cancel any amendments thereto.

"It is a further express condition of this trust that the trustor does hereby reserve to himself the sole and absolute right to receive, and said Trustor shall receive, during his lifetime, as his sole and separate property, all rents, interests, dividends, earnings, profits and other income from the Trust property, and also any liquidating dividends and other moneys or property which constitute withdrawals from, or diminution of capital (whether of any corporation whose stock is held hereunder or of any other trust property hereunder) and which when paid to and received by the Trustor would not constitute taxable income of the Trustor. The Trustor also reserves to himself, and he shall have the sole right, during his lifetime, to vote each and all of the shares of stock held in this trust. The Trustor hereby binds himself, during his lifetime, to pay, when due, all taxes, assessments, insurance, liens, charges and/or expenses necessary or proper for the preservation, maintenance or care of the trust property.

"Any proceeds or profits from the corpus of the trust property (as distinguished from income thereof), which may accrue during the lifetime of the Trustor, and also all liquidating dividends and all other payments to the Trustor or the Trustee out of capital (whether of any corporation whose stock is held hereunder or of any other trust property hereunder) other than as hereinaboe [sic] specifically reserved to the Trustor, shall be paid to and shall be invested by the Trustee in such property or securities as may be approved by the Trustor, and all rents, interest, dividends and other income of any such investments shall, during the lifetime of the Trustor, be paid to and belong to the Trustor as his sole and separate property.

"After the death of the Trustor, all rents, interest, dividends and other income and profits of the trust property shall be collected and received by the Trustee and shall be used, applied and devoted as follows:

"1. There shall first be paid out of the same all taxes, general and special assessments and all costs, charges and expenses incurred or expended in the collection, care, administration and protection of the trust property, for the payment of which this trust and/or the Trustee may become chargeable, including the protection of this trust, and its defense against legal attack, and also including any and all compensation to, and/or traveling and other expenses of, the officers, directors or employees of the Trustee in connection with their services in the care, administration and protection of the trust property, as the Board of Directors of the Trustee, in its discretion, may deem reasonable or necessary. Then there shall be paid out of said income from time to time, as the Board of Directors of the Trustee may in its discretion determine, such amounts as may be necessary to make good or replace losses suffered in the corpus of the trust property.

"2. Out of the balance of said income, after the deductions hereinabove provided, the Trustee may, and in the judgment of the Trustor should, each year set aside such sum as the Board of Directors of the Trustee shall in its sound discretion deem wise and expedient for investment, and said Trustee shall invest the same in accordance with subparagraph 3 of the powers hereinafter enumerated, which said investments, when made, shall become a part of the corpus or principal of the trust property, and the income and profits therefrom shall thereafter be used, applied and devoted as in this trust provided.

"3. The balance of said income, after the deductions and investments hereinabove provided, shall be used, applied and devoted by the Trustee exclusively to or for the advancement of any charitable use or purpose in the State of California as now is or may hereafter be authorized in the Articles of Incorporation of the Trustee and as the Board of Directors of the Trustee shall from time to time, in its discretion, select and determine; provided, however, that no part of

the net income or earnings of the trust property shall inure to the benefit of any member of The James Irvine Foundation, Trustee, nor shall any part thereof be used, applied or devoted to or for any other purpose than as hereinabove specified. Such income shall be used and applied by the Trustee, either by making donations or contributions to established charities exclusively engaged in the promotion of the purposes hereinabove mentioned, or by the establishment and/or support in whole or in part by the Trustee of charities devoted exclusively to the promotion of the same purposes, provided that all of such income shall not be devoted to any one or two charities to the exclusion of others.

"To carry out the express purpose of this trust and in aid of its execution and the proper administration, management and application of the trust property, the Trustee is vested, after the death of the Trustor, with the following additional powers and discretions:

"1. To have, respecting the shares of stock hereinabove described and all other securities which may be held in this trust, all the rights, powers and privileges of an owner, including the voting thereof and giving proxies therefor; provided, however, that the Trustee shall have no power to and shall not, except only by the affirmative vote of all of the members of the Board of Directors of the Trustee, sell, encumber, or otherwise dispose of any of the shares of stock of The Irvine Company held by the Trustee under this trust, and shall hold, maintain and administer the same under this trust as a unit without division or segregation thereof.

"2. As to any property which may hereafter be added to this trust, or any part thereof (exclusive of the shares of stock of The Irvine Company): to manage, control, sell, convey, lease, partition, subdivide, exchange, improve and to encumber by mortgage, trust deed or otherwise the same, at such times and in such manner and in accordance with such procedure and on such terms as the Board

of Directors of the Trustee may, in its discretion, deem advisable.

"3. To invest, reinvest and keep invested the principal proceeds of the trust property and any accumulated income therefrom not used and applied as hereinabove provided in any property or securities which the Trustee shall deem proper and advisable, whether or not permissible by law as investment for trust funds; provided that no part of the income therefrom shall be used or applied for any purpose other than as in this trust provided.

"4. All discretions in this trust conferred upon the Trustee shall, unless specifically limited, be absolute and uncontrolled, and their exercise by the Board of Directors of the Trustee conclusive on all persons interested in this trust.

"5. The powers and discretions of the Trustee enumerated herein are not to be construed as a limitation upon its general powers and discretions, but the Trustee and the Board of Directors thereof, as the same may from time to time be constituted, in addition thereto is hereby vested with and shall have, after the death of the Trustor and for the full duration of this trust thereafter, as to the trust property, the income therefrom and in the execution of this trust, the same powers and discretions that an absolute owner of property has or may have, subject to the provisions and conditions of this trust.

"Trustor hereby makes the following directions with respect to the management of the shares of stock of the Irvine Company and the property thereof, which consists for the most part of a land holding situated in Orange County, California; that inasmuch as the development and operation of said property has constituted the life work of the Trustor, it is the purpose of said Trustor, by the creation of this trust and by vesting in the Trustee through its holding of said stock of The Irvine Company, the exercise of a controlling voice in the operation of its properties, to perpetuate the operation thereof and thus insure an ade-

quate foundation for the charitable purposes herein provided. It is the Trustor's firm conviction that no other security could afford The James Irvine Foundation a more safe and stable investment than the capital stock of The Irvine Company, if this land holding is preserved and sustained at its present state of development, with such improvements, if any, as may be justified in the future. Portions of the land adjacent to and near the Pacific Coast and Newport Bay might from time to time be advantageously disposed of in various small parcels or units, and hill and unimproved property in larger units; but the great central valley acreage, together with such lands as are essential to the maintenance of the water supply thereto, should, in the judgment of the Trustor, be held and operated as a unit. The Trustor also cautions against disbursement of too large a part of the income or surplus of The Irvine Company. In furtherance of the policy heretofore established, liberal reserves of income must be accumulated and held for future needs and against unforeseen contingencies which have never yet failed to recur. For example, very large sums have already been expended out of accumulations of income in the construction of dams, the drilling of wells and installation of water distribution systems on and in the improvement of this property. Large expenditures will be required in the future to sustain and maintain such development and improvement.

"The Trustor has no intention or desire to restrict the Trustee in its selection of the specific charities to be benefitted [sic] by this trust, nor to make any exclusive designation thereof. Nevertheless, the Trustor interprets the charitable purposes of The James Irvine Foundation as stated in its Articles of Incorporation to include financial and generally to worthy individuals, who through illness or misfortune are temporarily in need. There is, for example, a very large body of self-respecting citizens who are not wealthy enough to afford for their families and themselves that same high quality of medical and surgical and hospital care which is open to the wealthy and also the very poor. It is the desire and hope of the Trustor that The James Irvine Foundation may find a means of extending such temporary aid to as many as possible of these worthy individuals and families, and in so doing, that worthy citizens and families residing in Orange County, California, be not overlooked.

"The Trustor also suggests that a revolving fund be created for loans not to exceed in the aggregate One Thousand Dollars ($1,000.00) per person, with very moderate rates of interest, to worthy students and scholars who are in need of financial aid to carry on their studies in institutions of learning in California, and also in moderate amounts to scientists or individuals engaged in research work who require financial assistance therein.

"It is also the direction of the Trustor that charities receiving the substantial part of their support from taxation should not be beneficiaries of any of the property derived from this trust, but that all such property, available from time to time for the benefit of charities, shall be used for such charities as do not enjoy any substantial support through taxation.

"IN WITNESS WHEREOF, the Trustor has executed these presents on the day and year first hereinabove written, and the Trustee has also executed these presents at the same time by its officers thereunto duly authorized, in token of the acceptance by the Trustee of the trusts hereinabove set forth.

JAMES IRVINE
Trustor

THE JAMES IRVINE FOUNDATION
By Myford Irvine
President
By E. M. Price
Secretary
Trustee"

At the annual meeting of the members of The James Irvine Foundation held on

May 25, 1937, the following appears in the minutes thereof:

"Upon motion duly made and seconded, the following resolution was unanimously adopted:

"RESOLVED, that the acts and deeds of Myford Irvine as President and E. M. Price as Secretary, respectively, of this corporation, The James Irvine Foundation, in executing for and in behalf of and as the corporate act and deed of this corporation, that certain Indenture of Trust dated the 24th day of February, 1937, between James Irvine as Trustor and this corporation as Trustee, and in accepting the trusteeship created by and under said Indenture of Trust and also in accepting delivery for and in behalf of this corporation as trustee under said Indenture of Trust, of the certificates of stock described in said Indenture of Trust, to-wit, 505 shares of the capital stock of The Irvine Company, and 12,-750 shares of the capital stock of The Moraga Company * * *, be and each and all of said acts are, hereby ratified, approved, confirmed and adopted as the acts and deeds of this corporation to the same effect for all purposes as if expressly theretofore authorized by express resolution of the Members of this corporation * * *."

On June 20, 1946, James Irvine addressed a letter to the Foundation. That letter, with the receipt of The James Irvine Foundation appearing thereon, was as follows:

"820 Crocker Building,
San Francisco, California,
June 20, 1946.

The James Irvine Foundation,
820 Crocker Bldg.,
San Francisco, California.

Attention: Mr. Myford Irvine,
President.

Gentlemen:—

Acting pursuant to the terms of that certain Indenture of Trust dated the 24th day of February, 1937, wherein I am Trustor and the James Irvine Foundation is Trustee, and wherein it is provided in part as follows:

It is understood and hereby made an express term and condition of this trust that other and additional securities or other property may from time to time hereafter be added by the Trustor to the trust property and become a part of the corpus of this trust, to ne [sic] held under all of the terms hereof,

It is also understood and hereby made an express term and condition of this trust that the Trustor may at any time and from time to time, at his sole will and discretion, by written instrument filed with the Trustee, revoke this trust in whole or in part, and may withdraw therefrom all or any part or parts of the property which may have been contributed to this trust by him, including all or any part or parts of the stocks hereinabove specifically described; and upon any such withdrawal, the Trustee shall forthwith convey and transfer by proper instruments and deliver the property affected thereby to the Trustor; and the Trustor may at any time amend this trust without limitation, or amend or cancel any amendments thereto.

I herewith hand to you as an addition to the trust property of said trust the following securities standing in my name and endorsed by me in blank:

Certificate No. 34 for 2 shares of The Irvine Company

Certificate No. 43 for 1 share of The Irvine Company

Certificate No. 44 for 1 share of The Irvine Company

Certificate No. 53 for 1 share of The Irvine Company

and revoke the said trust as to 12,750 shares of The Moraga Company, withdraw the said shares therefrom and request and require that you forthwith deliver to me a certificate or certificates for said number of shares of the said The Moraga Company.

By handing to you the signed original of this letter, I hereby acknowledge receipt of the said 12,750 shares of The Moraga Company. I request that you acknowledge reecipt [sic] of said above numbered certificates for shares of stock of The Irvine Company by The James Irvine Foundation upon the copy of this letter and return such copy to me.

Very truly yours,

(Signed) James Irvine"

"I hereby acknowledge receipt on behalf of The James Irvine Foundation from James Irvine of the above-mentioned certificates for five (5) shares of stock of The Irvine Company as an addition to said trust property as provided in the above-mentioned Indenture of Trust, dated the 24th day of February, 1937.

THE JAMES IRVINE
FOUNDATION,

(Signed) By: Myford Irvine,
President."

At a meeting of the Board of Directors of the Foundation held on June 26, 1946, the following appears in the minutes thereof:

"The President advised that he had accepted the five shares of stock of The Irvine Company as an addition to the trust property referred to in said instrument dated June 20, 1946 and had returned to Mr. James Irvine the 12,-750 shares of stock of The Moraga Company, which had been withdrawn from said Trust.

"After discussion of the matter, upon motion, duly made and seconded, the following resolution was unanimously adopted—

"RESOLVED, that the said five shares of stock of The Irvine Company be and they are hereby accepted as an addition to the trust property provided for in that certain Indenture of Trust dated the 24th day of February, 1937, wherein James Irvine is Trustor and this corporation is Trustee; and, the act of the President in accepting said shares of stock be and the same is

hereby ratified, confirmed and approved as the act and deed of this corporation.

"FURTHER RESOLVED that the act of the President in returning said 12,750 shares of stock of The Moraga Company to James Irvine pursuant to the request contained in said instrument of said James Irvine dated June 20, 1946, be and the same is hereby ratified, confirmed and approved * * * * "

The history of the stock certificates involved will next be noted. The indenture of trust of February 24, 1937, described 3 certificates of stock: certificate No. 28 for 332 shares, certificate No. 33 for 132 shares, and certificate No. 42 for 41 shares, or a total of 505 shares. In his letter of June 20, 1946, certificate No. 34 for 2 shares, certificate No. 43 for 1 share, certificate No. 44 for 1 share, and certificate No. 53 for 1 share, totalling 5 shares, were included in the indenture of trust. All of the certificates referred to were endorsed in blank by James Irvine. On April 21, 1941, certificate No. 33 for 132 shares and certificate No. 42 for 41 shares included in the original indenture were surrendered to the company. Certificates Nod. 45, 46, 47, and 48 for 10 shares each, certificates Nod. 49 and 50 for 5 shares each, and certificate No. 51 for 123 shares were issued in lieu thereof. All of those certificates were endorsed in blank by James Irvine. On November 7, 1947, following the death of James Irvine, Edna M. Price, the Secretary and Treasurer of The James Irvine Foundation, sent in for a transfer to the Foundation the certificates just described totalling 173 shares, together with certificate No. 28 for 332 shares and the certificates for 5 shares described in the letter of James Irvine of June 20, 1946. The certificates were accompanied by the consents of the inheritance tax departments of the States of West Virginia and California. Thereupon, certificate No. 54 for 510 shares was issued to The James Irvine Foundation on November 18, 1947. In 1963 a partial redemption of the stock in The Irvine Company was

made following which the total number of shares of stock outstanding was reduced to 855. Upon the partial redemption, The James Irvine Foundation was issued a certificate for 459 shares which is the stock in controversy in this action.

James Irvine made a number of gifts to the Foundation which do not involve the stock of The Irvine Company. Those gifts are not involved. There is not involved the status of The James Irvine Foundation. It was and is a valid charitable corporation. It has been given a federal tax exempt status by the Commissioner of Internal Revenue.

The contentions of the parties as stated by them in their pleadings and briefs will next be noted. The plaintiff contends:

1. That the indenture of trust is void and invalid as an attempted testamentary disposition by James Irvine, the trustor, since the indenture of trust was not executed in accordance with the requirements of the laws of California with reference to the execution of wills and, further, that the indenture of trust was a mere abortive and ineffectual testamentary disposition.

2. That the indenture of trust contains both non-charitable and charitable provisions which are so inseparably blended together that the same render the indenture of trust invalid and void in its entirety. That said provisions further suspend the power of alienation of the trust corpus and income in perpetuity contrary to law. A provision of the indenture of trust excludes from its benefits and charity all organizations as beneficiaries thereunder which are substantially supported by taxation or tax funds. That provision further renders the indenture of trust invalid and void. That the giving of the control of The Irvine Company to the trustee was illegal and contrary to public policy.

3. That the indenture of trust was absolutely void for all purposes and created no trust whatsoever because it conveyed neither legal nor equitable title to the Irvine stock in praesenti.

4. That there was no delivery of the Irvine stock or the indenture of trust by Mr. Irvine, as trustor, to The James Irvine Foundation, as trustee, or any possession or control thereof by the trustee until after the death of the trustor.

5. That upon the death of James Irvine the shares of stock of The Irvine Company referred to in the indenture of trust descended to the plaintiff and the other heirs or testamentary beneficiaries of James Irvine and that the said shares of stock (now 459 shares) should be awarded and distributed to the plaintiff and the other heirs or testamentary beneficiaries. The defendants contend:

1. That the indenture of trust created a valid charitable trust.

2. That the Foundation became the valid owner of the shares of stock in question and is the valid owner of them.

3. That the plaintiff's action is barred by laches.

4. That the plaintiff's action is barred by the statute of limitations.

5. That the plaintiff's action is barred by estoppel.

6. That the final decree of distribution in the estate of James Irvine is res adjudicata as to the claims of the plaintiff and hence is a bar to this action.

The plaintiff's contentions have two phases. One phase relates to the actions of James Irvine in connection with the indenture of trust and the shares of stock of the Irvine Company and the other relates to the provisions of the indenture of trust itself. The plaintiff contends that the actions of James Irvine in connection with the indenture and the certificates of stock in question were such that neither legal nor equitable title passed to the Foundation in praesenti. In that connection she asserts that there was no delivery of the indenture of trust or the certificates of stock by James Irvine or any possession or control thereof by the Foundation until after the death of James Irvine. It is the contention of the plaintiff that James Irvine retained possession of the indenture of trust and the shares of stock in question until his

death. It is the contention of the defendants that upon the execution of the indenture of trust by James Irvine it was delivered by him to the Foundation and that at all times thereafter it was in the possession of the Foundation. It is the contention of the defendants that the certificates of stock described in the indenture of trust and in the letter of James Irvine dated June 20, 1946, which had been endorsed in blank were delivered to the Foundation upon the execution of those instruments and that thereafter it was at all times in possession of those certificates or those issued in lieu thereof.

Since the principal transactions here under consideration took place more than thirty years ago, quite a number of persons who had to do with those transactions have died. Among such persons were Myford Irvine who was President of the Foundation and Miss Edna M. Price who was Secretary of the Foundation at the time of the transactions here involved. Some records which might bear on the transactions were not preserved. Because of storage problems, some ten years after the death of James Irvine and some six or seven years after the probate of his estate had been concluded, and when no litigation was pending or threatened in connection with his business affairs, his personal business records, after legal consultation, were disposed of. However, a number of persons who had familiarity with certain pertinent matters were still living and testified, and a considerable amount of documentary evidence relating to those matters was available and introduced into evidence.

There was a considerable amount of evidence presented relative to the matter of the possession of the certificates of stock in question and the indenture of trust during the lifetime of James Irvine. The greater part of that evidence related to the question as to whether the certificates of stock in question were kept by James Irvine in one of his safety deposit boxes during his lifetime or whether they were kept in the possession of the Foundation and kept in its safety deposit box.

The plaintiff and the defendants each call particular attention to certain documentary evidence and certain testimony in support of their contentions. The documentary evidence and the testimony to which the defendants more particularly call attention to in support of their contentions will next be referred to.

It was heretofore noted that on February 1, 1937, shortly prior to the execution of the indenture of trust on February 24, 1937, an organizational meeting of the Foundation was held at which Myford Irvine was elected President and Miss Edna M. Price was elected Secretary of the Foundation. At that meeting the following resolution was adopted by the Foundation:

"RESOLVED, that E. M. Price, the secretary of this corporation, the James Irvine Foundation, a California corporation, be and she is hereby authorized and empowered to rent a Safe Deposit Box for and in the name of this corporation at the Safe Deposit Vaults of the Crocker First National Bank of San Francisco and that access to such box shall be had only by Myford Irvine, the president, Paul A. Dinsmore, the vice-president, and E. M. Price, the secretary of such corporation, or any two of them, and that said three persons, to-wit: said Myford Irvine and Paul A. Dinsmore and E. M. Price, or any two of them, are hereby authorized and empowered for and in the name of and on behalf of this corporation to enter said box and place anything therein or remove therefrom any of the contents thereof."

Pursuant to that resolution, a safety deposit box was rented by the Foundation on April 20, 1937. That rental continued until July 22, 1965. James Irvine was never a Director or officer of the Foundation. He was never included among those specified to have access to its box.

On May 25, 1937, as heretofore noted, at a meeting of the members of the Foundation, a resolution was adopted ratifying the acceptance of the trusteeship under the indenture of February 24, 1937, by Myford Irvine and E. M. Price

and the delivery of the certificates of stock described in the indenture which were certificates for the 505 shares of Irvine Company stock.

On June 20, 1946, as heretofore noted, James Irvine by letter included five additional shares of Irvine stock under the indenture of trust. On June 22, 1946, Kent Sawyer, who was an attorney for James Irvine, wrote him a letter a portion of which was as follows:

"Mr. James Irvine
820 Crocker Building
San Francisco, California

Re: Transfers of Stock to
James Irvine Foundation

Dear Mr. Irvine:

In my discussion with you and Miss Price on June 21, it was brought to our attention by Miss Price that The James Irvine Foundation holds the stock certificates transferred by you to it endorsed in blank without registration on the books of corporations.

\* \* \*."

On July 9, 1946, Kent Sawyer wrote James Irvine a letter in which he stated that he confirmed his telephone advice that under the West Virginia Uniform Stock Transfer Act as long as the certificates of stock had been delivered there was no necessity of having the transfers entered on the books of The Irvine Company.

James Irvine died in the State of Montana on Sunday, August 24, 1947. At the time of his death he was the lessee of three safety deposit boxes. Two were rented from the Crocker First National Bank and were numbered 3550 and 4416. One was rented from the Wells Fargo Bank and was numbered 1412. The Irvine Company was a lessee of a safety deposit box with the Crocker First National Bank numbered 3867. On Tuesday, August 26, 1947, the banks sealed all the safety deposit boxes of which James Irvine was the lessee. Under the prevailing practice or rule, the safety deposit box or boxes of a corporation in which a decedent was an officer were sealed along with the decedent's personal safety deposit box or boxes. Under that practice or rule, the Crocker First National Bank sealed the safety deposit box of The Irvine Company.

The office of the Treasurer of the City and County of San Francisco was notified of the death of James Irvine and the sealing of the safety deposit boxes. On September 10, 1947, following a notice to the interested parties, Laurence Cames, a representative of the Treasurer of the City and County of San Francisco, opened, personally examined and inventoried the contents of the safety deposit boxes of James Irvine. He also opened and examined, but he did not inventory, the contents of the safety deposit box of The Irvine Company. There were present at the opening and examination of the safety deposit boxes Chaffee Hall, attorney for Robert H. Gerdes and Myford Irvine who had been named as Executors in the will of James Irvine, Myford Irvine, Edna M. Price, and Charles S. Wheeler, Jr., as attorney for Kathryn Irvine who had been named as Executrix in the will of James Irvine. Chaffee Hall testified at the trial. Laurence Cames, who opened, examined and inventoried the contents of the safety deposit boxes of James Irvine, died in 1953. There was on file in the office of the Treasurer of the City and County of San Francisco the original inventory of those contents made by Laurence Cames which was in evidence. That inventory does not list the 510 shares of stock of The Irvine Company in question. That inventory does not list the indenture of trust as being among the contents of the James Irvine safety deposit boxes. There are listed the 12,750 shares of stock of The Moraga Company which had been withdrawn from the Foundation by James Irvine in his letter of June 20, 1964, heretofore set out.

Chaffee Hall, who was present at the opening of the safety deposit boxes of James Irvine, testified that the certificates for the 510 shares of Irvine stock were not in any of those boxes.

Laurence Cames examined the contents of safety deposit box No. 3867 of The

Irvine Company. He did not list any property of James Irvine as being contained in that box.

In the minutes of the meeting of the members of the Foundation held on May 25, 1937, acknowledgment is made of the receipt by the Foundation of the certificates for 505 shares of Irvine stock.

At the end of the letter of James Irvine dated June 20, 1946, acknowledgment is made of the receipt by the Foundation of the certificates for five shares of Irvine stock described in the letter. In the letter itself James Irvine states that he is handing the Foundation the certificates endorsed in blank.

Robert H. Gerdes is an attorney. He drafted the will of James Irvine dated November 14, 1946. In connection therewith James Irvine told him that he had endorsed the certificates of stock of The Irvine Company in question in blank and had delivered them to the Foundation. Following the death of James Irvine the certificates of stock in question were produced for transfer to the Foundation by Miss Price, the Secretary of the Foundation.

It was heretofore noted that the original indenture of trust was not listed as being in the safety deposit boxes of James Irvine.

George L. Beaubien gave testimony by way of deposition. He was the personal bookkeeper and accountant for James Irvine from 1917 until his death in 1947. He took care of the personal business papers, books and records of James Irvine. He testified that James Irvine never kept any certificates of stock or other securities in the safe at his office and that all such items were kept in his safety deposit boxes. He further testified, in substance, that he had not seen the indenture of trust during his period of service with James Irvine.

On September 19, 1947, the original indenture was produced at a special meeting of the Board of Directors of the Foundation and was read by the Secretary to the assembled Directors.

The plaintiff calls particular attention to certain documentary evidence and certain testimony which she contends negates the contentions of the defendants as to the possession of the stock. That will be next referred to.

On February 9, 1949, the Executors filed a Federal Estate Tax Return for the estate of James Irvine. It was signed by Katharine Irvine, Myford Irvine and Robert H. Gerdes as Executors. In that part of the return entitled "General Information" the following appears: "If the decedent had a safe deposit box at the time of his death indicate under what schedules in this return the contents are listed Schedules B, C, and D." In Schedule B there are 78 items listing shares of stock. Item 78 is as follows: "78 510 shares The Irvine Company at $11,000 per share $5,610,000.00"

Note 8 is as follows:

" 8 These shares, prior to death, were transferred [sic] by decedent to a charitable corporation under the terms of a revocable trust. (See Item 1 of Schedule N.) Since the amount of the value of said shares is deductible under Schedule N from the value of the gross estate, said shares have not been formally appraised * * *."

Under Schedule N the following appears:

"CHARITABLE, PUBLIC, AND SIMILAR GIFTS AND BEQUESTS

Transfers for Charitable Purposes:

Amount

"1. To the James Irvine Foundation, Crocker Building, San Francisco, California.

"(a) By revocable Indenture of Trust, dated February 24, 1937, decedent transferred and assigned to The James Irvine Foundation, a California corporation, trustee,

Amount

(a) 505 shares of the capital stock of The Irvine Company, a West Virginia corporation; (b) all interest of decedent in the 200 shares of said The Irvine Company held in trust under the indenture of trust dated May 21, 1921, between decedent and James Irvine, Jr.; (See Section 6 of this schedule); and (c) 12,750 shares of The Moraga Company, a California corporation. Under the terms of said indenture, it is provided that decedent may add securities and other property to the trust and may also withdraw securities and other property from the trust; that decedent may amend the trust; that decedent during his life shall receive all dividends and other earnings of the trust estate and shall vote all shares of stock; that decedent is to pay all taxes and other expenses incident to the trust property; that after the death of decedent, the trustee shall apply the income of the trust estate to charitable purposes. A copy of said indenture is filed herewith, marked Exhibit N–1.

"(b) June 20, 1946, by letter, decedent added to the trust estate under the above trust 5 shares of The Irvine Company and withdrew therefrom said 12,750 shares of The Moraga Company. A copy of said letter, with the receipt of said The James Irvine Foundation appended, is filed herewith marked Exhibit N–2.

"The James Irvine Foundation, a California corporation, is a corporation organized and operated exclusively for charitable purposes, no part of the earnings of which inures to the benefit of any private shareholder or individual and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation. Filed herewith as Exhibit N–3 is a copy of the Articles of Incorporation of The James Irvine Foundation, and as Exhibit N–4 is a copy of a letter from the Commissioner of Internal Revenue dated November 9, 1939, as to the tax status of The Irvine Foundation.

"At decedent's death the net assets of said trust consisted of 510 shares of The Irvine Company. For the purpose of this Schedule N, the value of said shares is stated at the same amount as stated in Schedule B ......$5,610,000.00

"* * *."

The Internal Revenue Service raised no question as to excludability of the 510 shares of Irvine stock from the gross estate for estate tax purposes.

Robert H. Gerdes was one of the three Executors of the estate of James Irvine. He, along with the other two Executors, signed the Federal Estate Tax Return above referred to. The other Executors died some time ago. His deposition was taken in December, 1966. He testified as a witness at the trial. On both occasions he was examined and cross-examined at length in regard to the listing in that return of the certificates for 510 shares of Irvine stock in the schedule

relating to items in the safety deposit box of James Irvine at the time of his death. In his deposition he first testified that it was his recollection that those certificate were contained in a safety deposit box of James Irvine at the time of his death. Later in his deposition and at the trial he qualified his testimony as to that matter. He testified that at the time of the death of James Irvine he did not know the location of the certificates of stock; that he was not present at the opening of the safety deposit boxes of James Irvine and he would stand on the inventory of the contents of those boxes as made by a representative of the Treasurer of the City and County of San Francisco at the time they were opened.

The federal and state income tax returns of The Irvine Company commencing with the fiscal year of 1937 and ending with the fiscal year of 1948 were in evidence. In all of those forms there is a schedule entitled "Compensation of Officers." In the state form it appears as Schedule G. In the federal form it appears as Schedule F. In the schedules for those years it was reported that James Irvine was President of The Irvine Company; that he devoted three-fourths of his time to his duties as President of the company; that he received a specified compensation as President; and that he owned 547 shares of the common stock of the company. The 547 shares of stock necessarily included the 510 shares of Irvine stock covered by the indenture of trust.

In the minutes of the annual meetings of the stockholders of The Irvine Company during the years 1937 through 1946, reference is made in a column entitled "Present" to the shares of stock represented either in person or by proxy. In that column in a number of the minutes the following appears: "James Irvine— 549 shares." In that column in a number of other minutes the following appears: "Hellis voted proxy for Irvine Sr. owner and holder of 549 shares." These latter notations were made at meetings at which James Irvine was not present. The 549 shares referred to necessarily included the 510 shares included under the indenture of trust.

It was heretofore noted that on April 21, 1941, certificates of stock Nod. 33 and 42 for 132 shares and 41 shares described in the indenture of trust were surrendered to The Irvine Company and new certificates of stock issued in lieu thereof, which new certificates were endorsed in blank by James Irvine. The plaintiff asserts that it may be inferred from that occurrence that James Irvine at the time of the surrender and prior thereto had been in possession of all the certificates of stock described in the indenture of trust.

The plaintiff asserts that, considering the matters to which she specifically calls attention and considering the totality of the facts and circumstances shown by the entire record, it must be inferred that James Irvine never delivered the indenture of trust or the certificates for 510 shares of Irvine stock to the Foundation during his lifetime and that he at all times had those certificates in his possession and control. The defendants assert that the conclusions sought to be drawn by the plaintiff are based upon conjecture and speculation and are lacking in adequate evidentiary support. The defendants make certain contentions as to certain evidence referred to by the plaintiff. The defendants assert that the conclusion sought to be drawn by the plaintiff from the listing of the 510 shares of Irvine stock in the Federal Estate Tax Return relating to the property of the decedent found in his safety deposit boxes at the time of his death is negatived not only by the explanatory note made in connection therewith but also by the official inventory of the safety deposit boxes made by the representative of the Treasurer of the City and County of San Francisco.

The defendants assert that the information contained in Schedules F and G of the federal and state income tax returns as to James Irvine's ownership of The Irvine Company stock in question does not constitute adequate support for

the conclusion that he was in possession of the certificates. They assert that the income tax authorities desire the information requested in Schedules F and G for the purpose of passing upon the question as to whether the salaries of the officers of a corporation are reasonable so far as deductions are concerned and that the voting power or control of a corporation by a particular officer is an important consideration in that connection. James Irvine did retain the right to vote the stock in question during his lifetime and to receive the dividends thereon during his lifetime. Therefore, the defendants assert, and correctly so, that, for the purpose of control of the corporation in connection with salaries voted the officers and all other income tax purposes, James Irvine would be regarded by the Internal Revenue Service as the owner of the shares in question.

■ It was noted that in the minutes of the annual meetings of the stockholders of The Irvine Company referred to that James Irvine was treated as being the ostensible owner of the 510 shares of stock. While those shares had been endorsed in blank, they had not been transferred on the stock record book of the company. Therefore, of record James Irvine was the only person entitled to vote those shares. He reserved that right in the indenture of trust. He could not have voted them if they had been transferred. Therefore, so far as The Irvine Company was concerned, he was the owner of them for corporate voting purposes. The defendants contend, and correctly so, that under the applicable law as between James Irvine and the Foundation the fact that the shares had not been transferred on the stock record book of the company was not determinative as to their respective interests thereon. See Hausfelder v. Security-First National Bank (1946), 77 Cal.App.2d 478, 176 P.2d 84.

In connection with the surrender of the certificates of stock and the issuance of new certificates of stock referred to by the plaintiff, the defendants assert, and correctly so, that the record is silent as to facts and circumstances which surrounded the surrender of the certificates and the issuance of the new certificates. The record does show that the newly issued certficates were endorsed in blank by James Irvine.

■ The first issue for determination is the issue as to the delivery of the indenture. The signed acceptance of the Foundation of the trusteeship established by the indenture appears on the indenture. The indenture was not found in the safety deposit boxes of James Irvine following his death. There is lacking any evidence showing possession of the indenture by James Irvine following its execution. The only possession of it following its execution, as shown by the evidence, was the possession of the Foundation shortly following his death.

In connection with the matter of the delivery of the indenture, the defendants cite the case of Hall v. Hall (1948), 203 Ga. 656, 47 S.E.2d 806. In that case the Court stated (p. 810):

"'Where, at the request of a grantor, a person named as trustee in a deed which creates a trust enters his acceptance of the trust created upon such deed, such acceptance presumes conclusively a delivery of such deed by the grantor to the trustee.' New South Building & Loan Association v. Gann, 101 Ga. 678(2), 29 S.E. 15."

In the same connection they also cite the case of Jackson v. Pillsbury (Sup.Ct.Ill. 1942), 380 Ill. 554, 44 N.E.2d 537. In that case one Price executed a trust agreement. The trustee executed an acceptance of the trust. Following the death of Price, the administrator of his estate and certain of his heirs at law brought an action to have the trust agreement declared void. The validity of the trust was upheld. In that case the Court stated (p. 548 of 44 N.E.2d):

"Plaintiffs also insist that the trust agreement of September 8, 1933, was never delivered during Price's lifetime. * * * Manual delivery is unnecessary. Crow v. Crow, 348 Ill. 241, 180 N.E. 877. Where a binding agreement is signed by the parties, as in

the present case, it is of but little legal significance. Here, defendant [trustee] had accepted in writing the terms and provisions of the deeds made to him as trustee. This was a sufficient delivery. * * * "

The Court is of the view that the plaintiff has failed to establish the nondelivery of the indenture of trust. The Court is of the further view that the evidence preponderates in favor of a finding that the indenture of trust was, following its execution, delivered to the Foundation by James Irvine and that it was thereafter retained by it. The Court makes that finding.

■ The next issue for determination is the issue as to the delivery and possession of the certificates for the 510 shares of Irvine stock. The Court is of the view that the plaintiff has failed to establish the nondelivery of the certificates for those shares of stock. The Court is of the further view that the evidence preponderates in favor of a finding that, following the execution of the indenture of trust dated February 24, 1937, and his letter of June 20, 1946, James Irvine endorsed in blank the certificates described in those instruments and delivered them to the Foundation and thereafter during the lifetime of James Irvine the Foundation had in its possession certificates for 510 shares of Irvine stock, or those issued in lieu thereof, endorsed in blank. The Court makes that finding.

The first phase of the attack by the plaintiff on the title to the shares of stock involved was based upon the claimed nondelivery of the indenture and the certificates for those shares of stock. The Court having found that the indenture and the certificates of stock were delivered to the Foundation, there is left for consideration the other phase of the plaintiff's attack. That attack is based upon the provisions of the indenture of trust. The plaintiff asserts, and correctly so, that the fact the indenture and the certificates for the shares of stock involved had been delivered by James Irvine to the Foundation would not permit the defendants to prevail if the trust was an invalid trust. She contends that certain of the provisions of the indenture rendered the trust invalid. She contends that the indenture constituted a testamentary disposition of the shares of stock involved. The plaintiff asserts, and correctly so, that the indenture was not executed in accordance with the laws of the State of California relating to wills. She further contends that the indenture constituted a mere agency as to those shares which agency was revoked by the death of James Irvine. The plaintiff asserts that the indenture of trust suspends the power of the alienation of the corpus of the trust in violation of the rule against perpetuities.

■ The plaintiff contends, as just noted, that the trust is invalid under the rule against perpetuities. The indenture of trust suspends the power of alienation of the corpus of the trust in perpetuity. Section 9 of Article XX of the Constitution of California provides: "No perpetuities shall be allowed except for eleemosynary purposes." It is the well-established California rule that trusts for charitable uses and purposes are eleemosynary in purpose and hence without the scope of the rule against perpetuities. It is the contention of the plaintiff that certain provisions of the indenture of trust deprive it of the status of a trust for charitable uses and purposes under the rule referred to. Her contention has two phases. She asserts that the indenture of trust contains both noncharitable and charitable provisions which are so inseparably blended together as to deny the trust the status of a trust for charitable uses and purposes. Under the California law a trust the funds of which are authorized to be used for both charitable and noncharitable purposes falls foul of the rule against perpetuities. In re Sutro's Estate (Sup.Ct.Cal.1909), 155 Cal. 727, 102 P. 920; In re Kline's Estate (Cal.App.1934), 138 Cal.App. 514, 32 P. 2d 677. Under the California law a trust which would permit the trustee to devote the funds of a trust to a noncharitable

purpose also falls foul of that rule. In re Peabody's Estate (Cal.App.1937), 21 Cal.App.2d 690, 70 P.2d 249. The plaintiff asserts that the trust does not have the status of a trust for charitable uses and purposes because of a provision in the indenture of trust excluding tax supported charities from support by the trust. This latter ground of attack will be first considered. In paragraph 3 of the indenture it is provided that the income of the trust "shall be used, applied and devoted by the Trustee exclusively to or for the advancement of any charitable use or purpose in the State of California." In the last paragraph of the indenture it is stated:

"It is also the direction of the Trustor that charities receiving the substantial part of their support from taxation should not be beneficiaries of any of the property derived from this trust, but that all such property, available from time to time for the benefit of charities, shall be used for such charities as do not enjoy any substantial support through taxation."

It is the theory of the plaintiff that the direction for the excluding from the beneficiaries of the trust of tax supported charities has the effect of denying the trust the status of a valid trust for charitable uses and purposes and hence falls foul of the rule against perpetuities.

It appears from the records of the Foundation over the years which were introduced into evidence that there is no lack of California nontax supported organizations to whom the Foundation may properly make gifts. The records of the Foundation which are in evidence show a distribution of millions of dollars to innumerable California organizations.

The plaintiff has cited no authority in support of her contention that exclusion of tax supported charities from the beneficiaries of a trust renders the trust a noncharitable trust. It would seem that it was the view of the trustor that nontax supported charities were more needful of support than were tax supported charities.

It is the view and holding of the Court that the direction in the indenture of trust as to the exclusion of assistance to tax supported charities does not have the effect of denying the trust the status of a trust for charitable uses and purposes under the rule referred to.

The second phase of this attack on the validity of the trust under the rule referred to is based upon paragraph 2 of the indenture. In the paragraph preceding paragraph 2 provision is made for deductions from the income of the corpus of the trust for administrative expenses and to make good or replace losses suffered in the corpus of the trust. Paragraph 2 then provides as follows:

"2. Out of the balance of said income, after the deductions hereinabove provided, the Trustee may, and in the judgment of the Trustor should, each year set aside such sum as the Board of Directors of the Trustee shall in its sound discretion deem wise and expedient for investment, and said Trustee shall invest the same in accordance with subparagraph 3 of the powers hereinafter enumerated, which said investments, when made, shall become a part of the corpus or principal of the trust property, and the income and profits therefrom shall thereafter be used, applied and devoted as in this trust provided."

It is the theory of the plaintiff that under paragraph 2 the Board of Directors of the Foundation may in their uncontrolled discretion continually invest all of the income from the corpus of the trust and hence freeze all such income into the corpus of the trust and hence negate the use of income for charitable uses and purposes.

■ Under the California law gifts to charity are highly favored and trusts intended for charity are highly favored in the law and transfers in trust intended for charity must be liberally construed to uphold their validity whenever possible. Dingwell v. Seymour (Cal.App. 1928), 91 Cal.App. 483, 267 P. 327. In

that case the Court stated (pp. 507–508 of 91 Cal.App., p. 337 of 267 P.):

"[A] few quotations from leading cases and authorities on the attitude of courts toward charitable trusts are pertinent, since they have a direct bearing on the laws of construction: 'Charitable trusts are the favorites of equity; they are construed as valid whenever possible, by applying the most liberal rules of which the nature of the case admits, and are often upheld where private trusts would fail.' 11 C.J. 307. * * *"

Where a trust is established with a charitable corporation as trustee, the provisions in its articles of incorporation may be applied along with the provisions of the trust instrument to limit the trust to solely charitable purposes. Brown v. Memorial Nat. Home Foundation (Cal. App.1958), 162 Cal.App.2d 513, 329 P.2d 118, 75 A.L.R.2d 427. In that case the Court stated (pp. 520–521 of 162 Cal. App., p. 122 of 329 P.2d):

"Where a corporation becomes trustee of a benevolent trust the courts look first to its charter to determine the nature and extent of the dedication of its assets to eleemosynary purposes. * * *"

In the indenture of trust it is stated that the purpose and object of the trust is to assist California charities. The same purpose and object is stated in the articles of incorporation of the Foundation. The incorporation of the Foundation and the execution of the indenture of trust with the Foundation as trustee are closely related. The manifest objective of James Irvine in incorporating the Foundation and in executing the indenture of trust was to make it possible for a substantial part of his property to be devoted to the assistance of California charities.

Section 10207 of the California Corporations Code relating to nonprofit corporations provides as follows:

§ 10207. Examination by Attorney General: Institution of proceedings: Restriction on accumulation of income.

Each such corporation shall be subject at all times to examination by the Attorney General, on behalf of the State, to ascertain the condition of its affairs and to what extent, if at all, it may fail to comply with trusts which it has assumed or may depart from the general purpose for which it is formed. In case of any such failure or departure the Attorney General shall institute, in the name of the State, the proceedings necessary to correct the noncompliance or departure. Except as specially approved by the Attorney General such a corporation shall not accumulate income for a period longer than five years."

Section 9505 of the California Corporations Code provides as follows:

"§ 9505. Supervision by Attorney General where property held in trust: Institution of proceedings. A nonprofit corporation which holds property subject to any public or charitable trust is subject at all times to examination by the Attorney General, on behalf of the State, to ascertain the condition of its affairs and to what extent, if at all, it may fail to comply with trusts which it has assumed or may depart from the general purposes for which it is formed. In case of any such failure or departure the Attorney General shall institute, in the name of the State, the proceedings necessary to correct the noncompliance or departure."

California has enacted the Uniform Supervision of Trustees For Charitable Purposes Act, Secs. 12580–12595 inclusive, California Government Code. Under that Act the Attorney General is charged with the supervision of charitable corporations and trustees holding property for charitable purposes. Under the statutory provisions referred to, the Attorney General can by court action prevent the trustee of a charitable trust from departing from the objects and purposes of the trust.

The Attorney General of California filed a brief herein. In connection with the

contention of the plaintiff here under consideration, he stated:

"Reading the trust instrument as a whole, as we are required to do, it is clear that it cannot reasonably be interpreted as creating a trust for the purpose merely of enlarging the trust corpus. Rather, its *purpose* is the distribution of funds for charity. This being so, the power of the trustee to apply income to investments is necessarily circumscribed thereby.

"Powers of a trustee exist to carry out the trust objective. They may not be exercised independently and in opposition to the purpose of the trust. They are subordinate to the purpose of the trust and must be exercised in a manner that will further that purpose. * * * "

It would hardly seem that James Irvine, after going to the work and effort to set up the Foundation and making it the trustee under the indenture of trust for the clearly expressed purpose and objective of assisting California charities, either intended or contemplated that under paragraph 2 in the indenture of trust the Directors of the Foundation could in their uncontrolled discretion defeat that purpose and objective by continually freezing all of the income into principal.

The plaintiff's construction of the indenture of trust would result in the destruction of the trust. The Attorney General's construction of the trusts would result in its being preserved for the purpose of assisting California charities. It is the view of the Court that the Attorney General's construction is the more natural and reasonable construction.

It is the view and holding of the Court that the trust in question is a valid trust for charitable uses and purposes under the California law exempting such trusts from the rule against perpetuities.

The plaintiff contends that the indenture of trust is invalid for another reason. Under the indenture of trust The James Irvine Foundation would and did become the owner of the majority of the shares of stock of The Irvine Company. That ownership carried with it control of that company, including its dividend policies. The plaintiff asserts that such control gives rise to a conflict of fiduciary duties in the matter of the use of the income of The Irvine Company for the private commercial use by that company of the use of the income by the Foundation for charitable purposes. In that connection the plaintiff stated in her brief: "This conflict of fiduciary duties between charitable uses and private use of the available trust fund is against public policy and render the indenture of trust void." All gifts or bequests to charitable corporations of the majority of the stock of a private commercial corporation carry with it, as in the present case, the control of the latter corporation. Thus, it would seem that the plaintiff's contention encompasses the broad general question as to whether the ownership by a charitable corporation of the majority of the voting stock of a private commercial corporation is contrary to public policy.

Charitable corporations are usually incorporated under the laws of the different states. The matter of what powers such corporations may have and exercise and their regulation have heretofore been left to the states. Legislation by Congress as to such corporations has, in general, related only to the extent and character of the exemptions to be afforded them under the federal tax statutes. If Congress should deem it contrary to federal public policy for charitable corporations to have controlling interests in private commercial corporations, it could deny federal tax exemptions to gifts and bequests of such controlling interests and the income therefrom. So far Congress has not done so. The question as to whether Congress might legislate as to state incorporated charitable foundations under a constitutional power or constitutional powers other than the power of taxation is not involved because so far Congress has not done so. The California Legislature, if it deemed that gifts or bequests carrying with them the con-

trol of private commerical corporations are contrary to public policy, could under its power to regulate charitable corporations incorporated under the laws of California prohibit such corporations from receiving or retaining such gifts and bequests. So far the California Legislature has not done so. No California cases are cited which hold that it is contrary to public policy for a California charitable corporation to own the controlling interest in a private commercial corporation.

It is the view and holding of the Court that the indenture of trust is not illegal as being contrary to public policy.

■ The plaintiff makes certain other contentions. She contends that the indenture did not create a trust as to the 510 shares of Irvine stock but merely created an agency as to them which was revoked by his death. She also contends that the trust constituted an attempted testamentary disposition of those shares. The two contentions are closely related. In support of her contention as to testamentary disposition, the plaintiff cites and quotes from the case of Monell v. College of Physicians and Surgeons (1962), 198 Cal.App.2d 38, 17 Cal.Rptr. 744. In that case the Court stated (p. 751):

"If, however, a trust is the instrumentality for making a testamentary disposition of property, the document creating the trust must comply with the requirements prescribed for the making of wills. (Rest.2d Trusts, § 53.) In the comment to above section of the Restatement, it is stated: 'A testamentary disposition of property is a disposition to take effect upon the death of the person making the disposition and as to which he has substantially entire control until his death. Such a disposition is testamentary whether made by a will or a document which purports to be a will or made by a transaction inter vivos, as by a deed, unsealed writing or parol declaration or transfer.' * * *"

In that case the Court quotes from 1 Scott on Trusts as follows:

"'If the transaction were one which would involve merely an agency but for the fact that the legal title is technically vested in the person entrusted with possession, it is clear that the disposition is testamentary.'"

The quotes above set forth are relied on by the plaintiff. In the same case the Court further stated (p. 752):

"Where an interest in the trust property is created in the beneficiary during the lifetime of the settlor, such disposition is not testamentary 'merely because the settlor reserves a beneficial life interest or because he reserves in addition a power to revoke the trust in whole or in part, and a power to modify the trust, and a power to control the trustee as to the administration of the trust.' (Rest.2d Trusts, § 57; Nichols v. Emery, supra, 109 Cal. 323, 331, 41 P. 1089.) The principles enunciated by the last section are coordinated with the principles of agency. * * * *"

In the quotation just set out the Court cites in support of its statement the case of Nichols v. Emery (1895), 109 Cal. 323, 41 P. 1089. That case is a landmark case in this particular field which has since been followed by the California appellate courts. In that case one Nichols executed a deed of trust to certain land. In the deed of trust he retained the equivalent of a life estate in the land. In the deed of trust he reserved the power to revoke the trust. He died without having exercised that power. Following his death one of his heirs at law contended that the land in question constituted a part of the assets of his estate. The Supreme Court of California held that it did not. In that case the Court stated (p. 1091 of 41 P.):

"* * * But it is important to note the distinction between the interest transferred and the enjoyment of that interest. The enjoyment of the cestui may be made to commence in the future, and to depend for its commencement upon the termination of an existing life or lives, or an intermediate estate. * * *"

The Court also stated (p. 1091 of 41 P.):

" * * * In this case there remained in the grantor the equivalent of a life estate during his own life, and he was thus entitled to remain in possession of the land, or lease it and retain the profits. Nor did the fact that the settlor reserved the power to revoke the trust operate to destroy it, or change its character. He had the right to make the reservation. Civ. Code, § 2280. But the trust remained operative and absolute until the right was exercised in proper mode. * * * Indeed, this power of reservation was strongly favored in the case of voluntary settlements at common law, and such a trust, without such a reservation, was open to suspicion of undue advantage taken of the settlor. * * "

Under the indenture of trust in this case the trustor reserved the right to the dividends and other returns from the Irvine stock during his lifetime. He also reserved the right to vote the stock during his lifetime. He also reserved the right to revoke the trust in whole or in part. The trustor agreed during his lifetime to "pay, when due, all taxes, assessments, insurance, liens, charges and/or expenses necessary or proper for the preservation, maintenance or care of the trust property." In the indenture of trust it is first stated:

"That the trustor hereby transfers, assigns and conveys to the trustee, to have and to hold in trust, nevertheless and for the following trust uses and purposes, the following securities, to-wit:

"— 505 —shares of the capital stock of The Irvine Company, a corporation organized and existing under the laws of the State of West Virginia, and evidenced by the following certificates for the following number of shares, to-wit: * * *."

Then follow the certificate numbers of The Irvine Company stock and the certificate numbers of The Moraga Company stock. James Irvine revoked the indenture as to The Moraga Company shares at the same time he had added five more shares of The Irvine Company stock. He did not at any time revoke his transfer of The Irvine Company stock.

The plaintiff, in support of her contention that the indenture was testamentary in character, calls attention to certain provisions of the indenture. The indenture, following the trustor's reservation of the dividends from the stock during his lifetime, goes on to state "[A]fter the death of the Trustor" the trustee shall receive the dividends. The plaintiff also calls attention to paragraph 5 of the indenture which refers to the death of the trustor. That paragraph is as follows:

"5. The powers and discretions of the Trustee enumerated herein are not to be construed as a limitation upon its general powers and discretions, but the Trustee and the Board of Directors thereof, as the same may from time to time be constituted, in addition thereto is hereby vested with and shall have after the death of the Trustor and for the full duration of this trust thereafter, as to the trust property, the income therefrom and in the execution of this trust, the same powers and discretions that an absolute owner of property has or may have, subject to the provisions and conditions of this trust."

The plaintiff asserts that the connotation to be placed upon the words "[A]fter the death of the Trustor" contained in the indenture meant that no beneficial interest in the stock in praesenti was to pass to the Foundation until the death of the trustor.

In the case of Nichols v. Emery, supra, the Court, as heretofore noted, pointed out the distinction between the interest transferred and the enjoyment of the interest. The defendants herein assert that a transfer of a beneficial interest in the stock was made by the execution and delivery of the indenture and that the provisions in the indenture referred to by the plaintiff merely postponed the enjoyment of that interest until the death of the trustor. Under the rule of Nichols v. Emery, supra, neither the fact that

James Irvine reserved the right to the dividends on the stock during his lifetime nor the fact that he reserved the right to vote the stock during his lifetime nor the fact that he reserved the right to revoke the trust during his lifetime resulted in the transfers of stock being testamentary in character.

It is the view and holding of this Court that the transfers of the stock were not testamentary in character.

 The plaintiff makes the contention that the situation was such as to make the Foundation a mere agent of James Irvine in connection with the stock, which agency was revoked by his death. In connection with that contention the plaintiff sets forth Sec. 15, Bogert, Trusts and Trustees (2d edition 1965). That Section is as follows:

"Sec. 15. Agency.

"If property is transferred inter vivos to one who is described as a a trustee, with directions as to the disposition of the property on the death of the transferor, and the latter reserves to himself a high degree of control during his life, it may be found that the transaction amounted to the creation of an agency and not a trust, and that the attempted distribution of the property at the tranferor's death was testamentary in character and void because of informality.

"If a transaction is called a trust but gives too much power to the settlor and leaves the so-called trustee a mere tool, it has been held that there is in reality a mere agency."

It was heretofore noted that the Executors of the James Irvine estate filed a Federal Estate Tax Return and a California inheritance tax return, each return being accompanied by a copy of the indenture of trust. The Internal Revenue Service raised no question as to the 510 shares of Irvine stock being excluded from the assets of the estate for federal estate tax purposes. The situation was not the same in connection with the California inheritance tax return. The California inheritance tax return was han-

dled by Richard C. O'Connor, chief inheritance tax attorney for the California Inheritance Tax Department. After going over the return he on August 6, 1959, wrote a letter to Chaffee H. Hall, an attorney who was handling the probate of the James Irvine estate. After referring to a number of matters not here pertinent, he then continued as follows:

"It may be that the 1937 trust 'for the benefit of The Foundation' was no trust at all, but a mere agency. The extensive powers of revocation, of amendment, of reservation of income, of voting, of complete domination over the 'trustee' all reserved by the decedent would indicate that the corporation was only made the agent or custodian of the assets for the decedent; such agency being revoked by his death, the assets belonged to the estate."

Upon receipt of the letter Chaffee H. Hall communicated the contents of the letter to a number of attorneys representing beneficiaries under the will of James Irvine, including an attorney for the plaintiff's guardian. Mr. Hall was of the opinion that the view expressed by Mr. O'Connor was not well founded. Mr. O'Connor testified as a witness at the trial. He testified that his statement as to the matter of agency was only a suggestion on his part and that shortly following the writing of the letter he dropped the matter of including the 510 shares of stock in the assets of the James Irvine estate for inheritance tax purposes. Those shares were so excluded and later consent of the California Inheritance Tax Department was given to the transfer to the Foundation on the stock records of The Irvine Company of the 510 shares. Mr. O'Connor testified at the trial that he was of the view that the agency theory suggested by him in his letter was not well founded. The plaintiff contends the contrary. Obviously, the plaintiff is not bound by Mr. O'Connor's subsequent and present view that his earlier suggestion was not well founded. In the letter of Mr. O'Connor referred to, he makes the observation that

the trustee had "complete dominion over the trustee." That observation lacked evidentiary support. James Irvine, in connection with the incorporation of the Foundation, designated those who were to constitute its first Board of Directors. The Directors constituted all the members of the corporation. Under its articles of incorporation the Board of Directors selected their own successors in office, and hence the Board was self-perpetuating. James Irvine was at no time a member of the Board of Directors or an officer of the corporation. Two members of his family were on the first Board of Directors, but they constituted a minority of the Board. It was his expressed desire that the Foundation not be a family controlled Foundation. James Irvine reserved no power to designate the successors in office to the members of the first Board of Directors or to remove any Director from office. There is nothing in the articles of incorporation purporting to give James Irvine dominion over and control of the Foundation. The minutes of the Board of Directors and the minutes of the Foundation do not contain any reference to the presence of James Irvine at those meetings. However, it appears from the testimony that he did attend some of those meetings. The record is silent as to the extent of his participation in the discussion and deliberation at those meetings. It seems clear that James Irvine did not have dominion over and control of the Foundation, the trustee under the indenture of trust.

The contention of the plaintiff in regard to the matter of control is based, in part, on the control of James Irvine over The Irvine Company during his lifetime. In this connection in her brief it is stated:

"Mr. [James] Irvine retained the full control over The Irvine Company, his alter ego, and all of its land holdings and other assets, and the absolute power to alienate the same * * *. Mr. [James] Irvine, with his absolute control of 100 per cent of the stock of The Irvine Company, his alter ego,

had he so desired could have alienated or sold all of the assets of said Irvine Company at any time prior to his death."

It would seem that since James Irvine under his power of revocation contained in the indenture of trust could have withdrawn all the 510 shares from the Foundation, the fact he could have achieved what would be substantially the same result by alienating all the assets of The Irvine Company would not be of determinative legal significance.

The contention of the plaintiff as to the matter of agency is closely connected with the matter of testamentary disposition. If during his lifetime the relationship of James Irvine and the Foundation as to the shares was that of principal and agent, that relationship would, of course, have been terminated by his death. If the relationship was that of agency, then no valid trust was established as to the shares and James Irvine continued to be the owner of them for testamentary purposes; and the disposition by him under the indenture of trust would have been testamentary in character.

In the recent case of Dessar v. Bank of America National Trust & Savings Ass'n (1965), 353 F.2d 468, the United States Court of Appeals for this Circuit had before it the question as to whether the trust instrument there under attack created a valid trust or a mere agency under the applicable California law. In that case the trust instrument recited that certain personal property had been assigned and transferred to the trustee. In the trust instrument the trustor reserved during her lifetime the right (a) to change or amend any of the provisions of the trust, (b) to increase or decrease the amount provided to be paid to any beneficiary, (c) to change the beneficiary or beneficiaries, (d) to revoke the trust in whole or in part, (e) to take out of the trust any part or all of the trust property, (f) to receive the income on the trust property, and (g) to direct the trustee with respect to the investment or other disposition of the trust property.

The Court, after reviewing the California law on the subject, held that the trust instrument created a valid inter vivos trust and not a mere agency. The control retained by the trustor in the trust instrument in that case was as great if not greater than the control retained by the trustor in the present case.

It is the view and holding of the Court that the contention of the plaintiff that the relationship of the Foundation to the shares of stock here in question was that of a mere agent is not well founded.

It was heretofore determined by this Court that following the execution of the indenture of trust it was delivered to the Foundation. It is the contention of the defendants that if the indenture of trust was delivered it was not necessary under the California law that the certificates for the shares be delivered. In support of that contention they cite the following cases: Stone v. Greene (1919), 181 Cal. 569, 185 P. 670; Burkett v. Doty (1917), 176 Cal. 89, 167 P. 518; and Driscoll v. Driscoll (1904), 143 Cal. 528, 77 P. 471.

In the case of Burkett v. Doty, supra, the Court stated (p. 93 of 176 Cal., p. 520 of 167 P.):

"It must be remembered that, as between donor and donee, it is not necessary to the validity of a gift *inter vivos*, if made by a written instrument transferring the title to the donee, that the possession of the thing given [notes] be passed to the donee. * * "

In the case of Driscoll v. Driscoll, supra, the Court stated (pp. 535–536 of 143 Cal., p. 474 of 77 P.):

"There is no statutory requirement in this state that a gift which is effected by an executed grant shall be accompanied by a delivery of the property given, and, as between the parties to the transaction, there is no violation of law, or infringement of public policy, if the donor, after he has executed the instrument of gift, shall retain possession of the property. * * * "

In connection with the matter of the transfers of corporate stock, the defend-

ants cite, among other cases, the following: Francoeur v. Beatty (1915), 170 Cal. 740, 151 P. 123; Pollard v. Pollard (1959), 166 Cal.App.2d 698, 333 P.2d 356; Crocker v. Crocker (1927), 84 Cal. App. 114, 257 P. 611; Young v. New Pedrara Onyx Co. (1920), 48 Cal.App. 1, 192 P. 55.

In the case of Pollard v. Pollard, supra, it was held that a written assignment was sufficient to effect a valid transfer of stock in trust. In Bogert, Trusts and Trustees (2d edition 1965), Sec. 148, p. 54, n. 79, the *Pollard* case is cited in support of the following rule:

"A trust may be held created where there has been a delivery to the trustee of the instrument of transfer, even though documents representing property transferred were not handed to the trustee."

In the case of Francoeur v. Beatty, supra, the Court held that an executed written instrument was sufficient to effect an inter vivos transfer of stocks and bonds even though it was not accompanied by delivery of the securities. In that case the Court stated (p. 745 of 170 Cal., p. 125 of 151 P.):

"The gift was fully and effectually made to defendant when the written instrument in his favor was executed. It was not rendered executory because accompanied by no actual delivery to defendant of the property given, nor did the mere retention itself of the property by Mrs. Hitchcock [the donor] at all affect its validity as a perfect gift. * * * "

In the present case in the indenture of February 24, 1937, the trustor states that he "hereby transfers, assigns and conveys to the trustee" the 505 shares of stock described therein. The situation is the same as to the five shares of stock. It seems clear that under the California law the indenture upon its execution and delivery transferred to the Foundation a beneficial interest in praesenti in the shares of stock, subject only to being divested by the exercise by James Irvine of his power of revocation.

■ It was heretofore determined by this Court that James Irvine endorsed the certificates for the shares of stock in blank and delivered them to the Foundation. It is the well-established California law that the delivery of an endorsed certificate of stock is sufficient to effect a valid transfer of the shares of stock represented by the certificate. Oakland Scavenger Co. v. Gandi (1942), 51 Cal.App.2d 69, 124 P.2d 143; Hynes v. White (1920), 47 Cal.App. 549, 190 P. 836; Coward v. De Cray (1918), 38 Cal.App. 290, 176 P. 56.

■ It seems clear that under the California law the endorsement by James Irvine of the certificates for the shares of stock and the delivery by him of those certificates to the Foundation transferred a beneficial interest in praesenti in those shares of stock to it, subject only to being divested by the exercise by James Irvine of his power of revocation.

It is the view of this Court that none of the contentions of the plaintiff are well founded.

It is the holding of this Court that on the merits the plaintiff is not entitled to the relief sought by her herein.

In view of the denial of the plaintiff's claim on the merits, it is not necessary to consider the issues as to laches, statute of limitations, res adjudicata and estoppel.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties to this action and the subject matter of this action.

2. Under the indenture of trust dated February 24, 1937, a valid trust for charitable purposes was established.

3. The James Irvine Foundation as trustee of that trust has valid title to 459 shares of stock of The Irvine Company.

4. None of the heirs at law of James Irvine and none of the beneficiaries under his will have any right or title to, or any interest in, those shares.

## ORDER FOR JUDGMENT

It is hereby ordered that judgment shall be entered:

1. Adjudging that the indenture of trust dated February 24, 1937, established a valid trust for charitable purposes.

2. Adjudging that The James Irvine Foundation as trustee of that trust has valid title to 459 shares of stock of The Irvine Company.

3. Adjudging that none of the heirs at law of James Irvine and none of the beneficiaries under his will have any right or title to, or any interest in, those shares.

4. Dismissing the plaintiff's amended complaint with prejudice and rendering final judgment herein in favor of the defendants.

5. Assessing the taxable costs of this action against the plaintiff.

The foregoing constitutes the Findings of Fact, Conclusions of Law, and Order for Judgment herein.